UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

MATTHEW CATANZARO,

                    Plaintiff,                                    Case No. 1:09-cv-2

v.                                                                         Honorable Gordon J. Quist

MICHIGAN DEPARTMENT
OF CORRECTIONS et al.,

                    Defendants.
_____/

## **OPINION**

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Michigan Department of Corrections, Carmen Palmer, D. Bolton, Fritz Jackson, N. Morales, (unknown) Cheeks, T. Kasdrof, Michael Larabell, Norm Pierce, (unknown) Bracy, J. Rozier, D. Boseley, Bradley Showers, Blaine Lafler, Laura Krick, L. Gibbons,

R. Gilbert, B. Scott, C. LeDuke, Doug Dingeldey, and R. Ault.  The Court also will dismiss Plaintiff's Eighth Amendment and access-to-the-courts claims, as well as his First Amendment retaliation claims based on a major misconduct and on his transfer to the Boyer Road Correctional Facility as against all remaining Defendants.  The Court will serve the complaint against Defendants Patricia Caruso, Gary Ball, Holly Stine, Elly Wolter, Todd Butler, J. Booth, T. McKendry and Lillian Tefft, limited solely to the retaliation claims not dismissed, such as the alleged filing of retaliatory minor misconducts and the false completion of Plaintiff's parole and prisoner re-entry forms.

### Discussion

I.      Factual allegations

Plaintiff Matthew Catanzaro presently is incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Mid-Michigan Correctional Facility, though the actions he complains of occurred while he was housed at the Deerfield Correctional Facility (ITF) and the Boyer Road Correctional Facility (OTF).  The case initially was filed in the Eastern District of Michigan.  In his original complaint, Plaintiff named 33 Defendants, only one of whom, Bruce Curtis, resided in the Eastern District of Michigan.  Upon review, the Eastern District of Michigan dismissed Defendant Bruce Curtis for failure to state a claim.  The remainder of the complaint was transferred to this Court.

On January 28, 2009, Plaintiff filed an amended complaint.[1]  In his amended complaint, Petitioner failed to name three Defendants named in his original complaint: Dennis

---

[1]Pursuant to FED. R. CIV. P. 15(a)(1)(A), a plaintiff may amend a complaint once without leave of court at any time before being served with a responsive pleading.

Straub, S. Allen and Laura Gidley.[2]  As a consequence, those Defendants currently named in the complaint before the Court are as follows: the MDOC; MDOC Director Patricia Caruso; MDOC Central Office Classification Officer B. Scott; MDOC employee C. LeDuke; MDOC Department Technician L. Gibbons; MDOC Correctional Facilities Administrator R. Gilbert; ITF Warden Carmen Palmer; ITF Deputy Warden Dough Dingeldey; ITF Assistant Deputy Warden Gary Ball; ITF Resident Unit Managers (RUM) D. Bolton and R. Ault; ITF Assistant Resident Unit Supervisors (ARUS) T. Kasdrof[3] and Todd Butler; ITF Sergeants (unknown) Bracy and N. Morales; ITF Lieutenant (unknown) Cheeks; ITF Library Technicians Holly Stine and Lillian Tefft; ITF Transfer Coordinator Michael Larabell; ITF Corrections Officers Elly J. Wolter, J. Rozier, D. Boseley, J. Booth and T. McKendry; OTF Transfer Coordinator Bradley Showers; OTF Warden Blaine Lafler, OTF Assistant Deputy Warden Laura Krick; Hearing Officer Fritz Jackson; and Michigan Reformatory Law Librarian Norm Pierce.  He sues all Defendants in their personal capacities, with the exception of the MDOC and Patricia Caruso, whom he sues in their official capacities.

In his lengthy amended complaint, Plaintiff complains of a wide variety of conduct. His first set of allegations involve exposure to environmental tobacco smoke (ETS).  Plaintiff alleges that when he arrived at ITF on January 17, 2008, he advised Defendants Morales and Cheeks that he had a current medical detail to be placed in tobacco-free housing.  Defendants did not place Plaintiff in a tobacco-free housing unit, despite the fact that a bed was available in the unit and a number of inmates housed in the unit did not have a medical detail.  The next day, Plaintiff woke

---

[2]Because the amended complaint superseded the original complaint, the three individuals no longer are properly considered Defendants in the action.

[3]At various points in the amended complaint, Plaintiff spells Defendant's name "Kasdrof" and as "Kasdorf." The Court has used the spelling set forth in the list of Defendant names and addresses set forth on pages 2 to 3 of the amended complaint.

up to a strong stench of smoke, a tightened chest, burning eyes, pounding head and dizziness. Plaintiff approached Defendant ARUS Kasdrof with a copy of his medical detail and told Kasdrof that he was in pain and suffering.  Kasdrof denied access to the housing.  On January 23, 2008, Plaintiff spoke to Kasdrof again about the issue with respect to a grievance.  Plaintiff also sent a kite to Defendant ARUS Butler, informing Butler that he was in pain.  Butler, too, denied placement in tobacco-free housing.  According to Plaintiff, he continued to be exposed to ETS and to suffer for 60 days, experiencing chest pain; loss of sleep; racing heart; burning eyes, throat and lungs; breathing difficulties and a substantial risk of future health problems.  He also alleges that he submitted a request for health care but did not receive a response.

His second set of allegations involve access to the law library.  Plaintiff alleges that on February 17, 18, 25, 27, and 29, 2008 and March 4, 6, 7, 10, 11, and 12, 2008, he signed up for law library but was not put on the call-out list by Defendant Library Technician Tefft.  Plaintiff complained to Defendant Assistant Deputy Warden Ball, representing that he had motions to file on an unidentified state lawsuit and that he was working on a federal habeas corpus action and a federal civil rights complaint under 42 U.S.C. § 1983.  Ball responded that Plaintiff was not following policy.  Plaintiff also complains that Defendant Tefft took six days to make copies of documents submitted on March 1 and 3.  Plaintiff alleges that he was complaining about being denied access to the courts by Tefft, and Ball told him not to write any more kites on the subject or threaten Ball.  He also told Plaintiff that he could not go to the library without being on the call-out list and that he could not ask to be on the call-out list during the time he was assigned to be at work. Plaintiff alleges that, because of the limitations on his library access, he was required to file his federal habeas action with his lower court brief attached and he had to send the pleadings to his brother in order to receive copies.  Plaintiff also alleges that Tefft reads his legal papers and that she

notified staff of his lawsuits against them, which allegedly caused retaliation.  Plaintiff filed a grievance.

In addition, Plaintiff alleges that, on January 22, 2008, Defendant Booth denied him permission to leave the unit to give legal mail to Defendant Kasdrof for mailing.  He alleges he was told that Kasdrof did not see prisoners before 10:00 a.m.  Plaintiff told Booth that Kasdrof's practice violated prison policy allowing prisoners to send out legal mail before 10:00 a.m.  Plaintiff filed a grievance.  On February 21, 2008, Defendant Booth asked Plaintiff to bring all of his copies of grievances to Booth.  Booth told Plaintiff that "inmates like you are trouble and we got a place for you. . . .[Y]ou are going to do hard time."  (Am. Compl., ¶ 14.)  Plaintiff told Booth that his statements were retaliatory and that he would advise Judge Enslen, who presided over Plaintiff's civil rights action under 42 U.S.C. § 1983.  Booth replied, "[T]hat senile old judge, I'll have you sent so far away you wont [sic] be able to contact him and I run this ship."  (Am. Compl., ¶ 15.)  Plaintiff alleges that he suffered headaches as a result of the retaliation.  He filed another grievance.

On March 19, 2008, Defendant Booth wrote a minor misconduct ticket on Plaintiff for using a catalog order form as paper for the extra pages to a grievance filed on March 14, 2008.  Plaintiff alleges the ticket was issued in retaliation for the two previously filed grievances against Booth.  Plaintiff was found guilty of the ticket by Defendant Butler, despite Plaintiff's claims that the ticket was retaliatory and in violation of policy.  Plaintiff appealed the misconduct to Defendant Ball.  Ball found Plaintiff guilty.  He alleges that Booth, Butler and Ball conspired to retaliate against Plaintiff and that he suffered headaches and stress as a result.  Plaintiff filed another grievance against Booth for lying in the misconduct ticket.

On April 29, 2008, Defendant Wolter allegedly denied Plaintiff access to the court by refusing to allow him to go to the library to request copies necessary to make a responsive filing

demonstrating that he had exhausted his administrative remedies in an Ingham County Circuit Court action.  He alleges that, during his scheduled work hours but after he had completed his job assignments, he asked Defendant Wolters for a hand pass to the library, allegedly in accordance with policy.  Wolter denied his request, yelling, "[W]e are not going to jump everytime you wan't [sic] to go to the [law library]."  (Am. Compl., ¶ 23.)  Plaintiff complained that S. Allen had told him he could bring his copies in and that the policy allowed hand passes.  Wolter told Plaintiff that shift command had told her not to write Plaintiff a hand pass for the law library for any reason.  Plaintiff asked for a grievance form.  Wolter allegedly screamed at Plaintiff to leave her office as he had been told to stay out.  Plaintiff went to his living area to get his coat, and Wolter followed, giving him his grievance form but reiterating that he was not to enter her office, which has a sign saying "Authorized Personnel Only."  (Am Compl., ¶ 26.)  Plaintiff left the unit to go to the Control Center to try to resolve the issue.  He was stopped by Defendants Rozier and Boseley.  He explained to both officers that he was being prevented from litigating his lawsuit because he had been forced to take a job he did not want.  Both officers denied him access to the Control Center and the library.  On April 30, 2008, Plaintiff complained to Defendants Butler and Bracy about the limitation on his use of the library during his assigned work times, saying that the limitation violated policy and federal law.  The officers allegedly told Plaintiff that were not going to change their practice.

Plaintiff filed a grievance about the library denial on May 6, 2008, naming Defendants Palmer, Dingeldey, Ball and Tefft, ostensibly in order to place them on notice of the continuing denial of access to the courts.  On May 7, 2008, Defendant Wolter fired Plaintiff and wrote a major misconduct ticket stating that he had not put up a sign while cleaning the bathroom, had not mopped the floor, and had left the unit while he was on work detail.  Plaintiff filed a grievance, alleging that the misconduct ticket was retaliatory and including inmate affidavits to the

adequacy of his cleaning and use of signs.  On May 12, Plaintiff was interviewed by Defendant Butler on the grievance.  Butler allegedly stated that the firing was improper and that he would get Plaintiff reinstated, but he refused to recommend that the warden dismiss the ticket.  Butler informed Plaintiff that, while Wolter may have jumped the gun, Classification Director Christian was going to fire Plaintiff in a few days and put him on "00" status, which would require him to remain in his bed area during work hours.  Plaintiff told Butler that his back was hurt anyway, so Butler should probably just let the termination stand.  Butler interpreted the statement as a refusal to work and threatened to put him on 00 status immediately and issue a ticket.  Butler informed Plaintiff that he had no "right to work or not work or not to be fired or even have a true ticket wrote on you, once the ticket leaves the hand of any staff member, it's up to the Hearing Investigator and Hearing Officer to determine if the ticket is valid or not, all the grievances and law suits you file you should know it's not worth it is it."   (Am. Compl., ¶ 38.)  Plaintiff disagreed and threatened to prove it by suing.  Defendant Jackson found Plaintiff guilty of the misconduct on May 29, 2008, despite Plaintiff's claims that the firing and misconduct were retaliatory.

Butler told Jones and Morales that Plaintiff was back to work and Plaintiff was told to clean the rest room during count.  At approximately 4:30 p.m., Plaintiff began to work, despite being in pain.  While picking up the mop bucket, he experienced a sharp pain in his back and his legs gave out, causing him to fall on the floor.  Morales sent Plaintiff to health care, and Nurse Nash gave Plaintiff a prescription for Flexeril, ice and a no-work medical detail.  She scheduled Plaintiff for an appointment with Dr. Gerlach.  Plaintiff gave the medical detail to Defendant Morales and returned to his unit.  Plaintiff filed a grievance against Butler for returning Plaintiff to work, which Palmer denied.  Plaintiff alleges that Palmer's response falsely recited the date he received his medical detail.

Plaintiff alleges that he was again denied copies by Defendant Stine on July 25, 2008, who allegedly was acting on Defendant Ball's instructions.   Plaintiff contends that he needed the copies of certain affidavits and documents for a federal court complaint.   Plaintiff states that Stine fabricated the reason for the denial, declaring that it was contraband.   Plaintiff filed another grievance.   Defendant Ault interviewed Plaintiff about the grievance on August 13, 2008.   Ault allegedly told Plaintiff that he was suing staff and he would never again get copies at that facility. Ault and Dingeldey reported on the grievance form that the copies were denied as they included three pages of legal work from other prisoners, which is contraband.   Defendant Warden Palmer rejected the grievance at Step II for the same reason.   Plaintiff alleges that he was prevented from filing his lawsuit by Defendants' actions.

On August 7, 2008, while Plaintiff was in the library preparing motions, Defendants Stine and Fox spoke together. Stine apparently recognized Plaintiff's handwriting on a kite made out in another prisoner's name. She advised Plaintiff that the prior librarian would have written a ticket on him. Fox and Stine whispered again before Stine asked if Plaintiff was assisting Garrison with his legal work. Plaintiff denied it, but Stine directed Garrison to move to another table. Shortly thereafter, Plaintiff requested copies. Stine left the library to make copies, and she returned minutes later with Corrections Officer Dygert (not named as a Defendant), who yelled at Plaintiff for filling out a kite for another prisoner after he had been told not to help anyone else with legal work. Defendant Stine and Officer Dygert allegedly argued with Plaintiff and told him that they were writing a misconduct in order to kick him out of the library so that he could not pursue his lawsuits. Plaintiff alleges that he was prevented from filing his motions on that day.

The following day, as Plaintiff and Garrison were going to their library call out, Fox told Plaintiff, "I know you are doing Garrisons [sic] legal work, inmates told me you have filed a

law suit together and I talked to Ms. Stine about it, she already knew, I don't care what she do[es] but I'm going to do all I can to stop you, Stine will not be here tomorrow and if I see you two sitting by each other talking to each other, even looking at each other, I'm kicking you both out and writing tickets on both of you." (Am. Compl., ¶ 69.) When Plaintiff reached the library, Stine gave him his copies and told him that she did not care if he sat with Garrison and talked, just not to be obvious about helping Garrison. She told him that they had had a misunderstanding but she believed they could get along if he signed off on his grievance. Stine also allegedly told Plaintiff that Defendant Norm Pierce, the head librarian for ITF and the Michigan Reformatory had told her to deny Plaintiff copies and kick him out of the library.

According to Plaintiff, Stine then gave him sticky notes and two highlighters. Plaintiff states that he discovered they were considered escape paraphernalia and threw them away. On August 14, 2008, Defendant McKendry searched Plaintiff's property and found the highlighters. McKendry wrote a misconduct ticket on Plaintiff and told Plaintiff to pack up as he was being transferred. Plaintiff alleged the misconduct ticket was retaliatory and that the highlighters were not in his possession. Plaintiff filed another grievance, which was denied by Defendant Palmer at Step II. Plaintiff alleges that Defendants Dingeldey and Ball made false statements in the grievance responses. Plaintiff also alleges that on February 21, 2008, Defendant Larabell threatened him with a transfer for filing grievances by refusing to take action on Plaintiff's complaint that Defendant Booth threatened to transfer him. In addition, he alleges that ITF Defendants Gibbons, Scott, Dingeldey and Ball participated in the retaliatory transfer. Further, Plaintiff alleges that OTF Defendants Transfer Coordinator Showers, Assistant Deputy Warden Krick, Warden Lafler, and MDOC Central Office employees Gilbert and LeDuke conspired in the retaliatory transfer of Plaintiff from ITF to OTF in order to punish Plaintiff for his lawsuit.

According to the complaint, on August 8, 2008, Defendant ARUS Butler improperly completed a Parole Eligibility Report (PER) and completed a new evaluation for the COMPAS Re-Entry Evaluation.  Plaintiff alleges that both contained incorrect information.  Plaintiff filed a kite, but Butler refused to change the forms, stating that the documents Plaintiff relied upon were not in his file.  Butler eventually found the documents and made some changes.  Plaintiff grieved the inaccuracies.  He was interviewed by Defendant Bolton on his grievance about Defendant Butler.  Defendant Bolton found that the errors had been corrected.  Plaintiff alleges that Bolton's findings were wrong.

Between May 2008 and August 12, 2008, Plaintiff complained to Defendant Butler that the paint was chipping off his bed rail and making him sick.  He alleged that he would wake up with paint chips on his hands, face and mouth and that his face cloth, towel and bed sheets were covered.  He contends that he experienced headaches, vomiting, diarrhea, and a rash, all allegedly caused by the paint chips.  He grieved the problem and raised it in the Warden's Forum.  According to Plaintiff, Defendant Butler threatened to transfer Plaintiff for his complaints.  Butler denied the grievance at Step I and Palmer denied it at Step II.

Plaintiff alleges three basic causes of action.  First, he asserts that his rights under the Eighth Amendment were violated when he was exposed to excessive ETS, when he was forced to work with a back injury, and when he was exposed to toxic paint chips.  Second, he alleges that Defendants conspired against him and deprived him of his right of access to the courts and to substantive and procedural due process.  Third, he contends that Defendants conspired against him and retaliated against him in violation of the First Amendment.

For relief, Plaintiff seeks substantial compensatory and punitive damages.  He also seeks declaratory relief in the form of removing the misconduct tickets from his record and

correcting the mistakes in his PER and COMPAS/TAP files.  He also seeks an injunction barring further violations of his First, Eighth and Fourteenth Amendment rights.

II.      Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v.* Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *see also Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).   The standard requires that a "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory."  *Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 346 (6th Cir. 2001).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombley*, 127 S. Ct. at 1965; *Lewis v. ACB Business Serv., Inc.*, 135 F.3d 389, 405 (6th Cir. 1998) (holding that a court need not accept as true legal conclusions or unwarranted factual inferences).  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 127 S. Ct. at 1974; *see also United States v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008); *United States ex rel. Bledsoe v. Comty. Health Sys., Inc.*, 501 F.3d 493, 502 (6th Cir. 2007).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996).  Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

A.      **Immunity**

1.      Sovereign immunity

Plaintiff may not maintain a § 1983 action against the Michigan Department of Corrections.  Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, if the state has not waived immunity and Congress has not expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826  (6th Cir. 1993).  Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court.  *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment.  *See, e.g.*, *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000); *Erdman v. Mich. Dep't of Corr.*, No. 94-2109, 1995 WL 150341, at *1 (6th Cir. Apr. 5, 1995); *Cullens v. Bemis*, No. 92-1582, 1992 WL 337688, at *1 (6th Cir. Nov. 18, 1992); *Adams v. Mich. Dep't of Corr.*, No. 86-1803, 1987 WL 36006, at *1 (6th Cir. May 7, 1987).  In addition, the State of Michigan (acting through the Michigan Department of Corrections) is not a "person" who may be sued under § 1983 for money damages.  *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)).  Therefore, the Court dismisses the Michigan Department of Corrections.

Plaintiff has also sued Patricia Caruso, Director of the MDOC, in her official capacity.  A suit against an individual in his official capacity is equivalent to a suit brought against the governmental entity: in this case, the Michigan Department of Corrections.  *See Will v. Mich.*

*Dep't of State Police*, 491 U.S. 58, 71  (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  An official-capacity defendant is absolutely immune from monetary damages.  *Will*, 491 U.S. at 71; *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 456 (6th Cir. 1998); *Wells v. Brown*, 891 F.2d 591, 592-93 (6th Cir. 1989).  Therefore, the Court also dismisses the suit for monetary relief against Defendant Caruso in her official capacity.

2.      Judicial immunity

Defendant Jackson is a hearing officer whose duties are set forth at MICH. COMP. LAWS § 791.251 through § 791.255.  Hearing officers are required to be attorneys and are under the direction and supervision of a special hearing division in the Michigan Department of Corrections. *See* MICH. COMP. LAWS § 791.251(e)(6).  Their adjudicatory functions are set out in the statute, and their decisions must be in writing and must include findings of facts and, where appropriate, the sanction imposed.  *See* MICH. COMP. LAWS § 791.252(k).  There are provisions for rehearings, *see* MICH. COMP. LAWS § 791.254, as well as for judicial review in the Michigan courts. *See* MICH. COMP. LAWS § 791.255(2).  Accordingly, the Sixth Circuit has held that Michigan hearing officers are professionals in the nature of administrative law judges.  *See Shelly v. Johnson*, 849 F.2d 228, 230 (6th Cir. 1988).  As such, they are entitled to absolute judicial immunity from inmate's § 1983 suits for actions taken in their capacities as hearing officers.  *Id.*; *and see Barber v. Overton*, 496 F.3d 449, 452 (6th Cir. 2007); *Dixon v. Clem*, 492 F.3d 665, 674 (6th Cir. 2007); *cf. Pierson v. Ray*, 386 U.S. 547, 554-55 (1967) (judicial immunity applies to actions under § 1983 to recover for alleged deprivation of civil rights).  Therefore, the Court will dismiss the complaint against Defendant Jackson.

Plaintiff also makes allegations against Defendants Butler, Ball and Kasdrof for their determinations on minor misconduct tickets.  Their duties as facilities hearing officers are described

by MICH. DEP'T OF CORR., Policy Directive 03.03.105, ¶ F(3) and MICH. ADMIN. CODE R. 791.3310. The policy includes provisions for appeals of the hearing officer's written determination. Defendants Butler, Ball and Kasdrof are thus entitled to immunity for their decisions on minor misconducts.

### B.     Insufficient Allegations of Active Unconstitutional Conduct

Plaintiff fails to make specific factual allegations against Defendants Palmer and Bolton other than that they failed to conduct an investigation in response to his grievances and denied those grievances. Plaintiff also raises claims against Defendants Butler, Ault, Ball and Dingeldey based on their denial of grievances or failure to investigate grievances. A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summer v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). Plaintiff has failed to allege that Defendants Palmer and Bolton engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them. Plaintiff also fails to state a claim against Defendants Butler, Ault, Ball and Dingeldey based on their denials of grievances or alleged failures to investigate grievances.

### C.     Eighth Amendment

Plaintiff claims that he was subjected to cruel and unusual punishment under the Eighth Amendment when he was exposed to ETS, exposed to paint chips and required to work when he had a bad back. The Eighth Amendment imposes a constitutional limitation on the power of the

states to punish those convicted of crimes.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981).  The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346).  The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

An Eighth Amendment claim comprises objective and subjective components:  (1) a sufficiently grave deprivation and (2) a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 1977 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001); *Woods v. LeCureux*, 110 F.3d 1215, 1222 (6th Cir. 1997).  A prison official cannot be found liable unless the official has acted with deliberate indifference; that is, the official must know of and disregard an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837; *see also Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991) (deliberate indifference standard applies to all claims challenging conditions of confinement to determine whether defendants acted wantonly).  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. *Farmer*, 511 U.S. at 837.  Thus, the mental state required for an Eighth Amendment claim is not actual intent, but something close to common-law

recklessness. *Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008) (citing *Farmer*, 511 U.S. at 839).

The reason for focusing on a defendant's mental attitude is to isolate those defendants who inflict punishment. *Farmer*, 511 U.S. at 839. The deliberate indifference standard "describes a state of mind more blameworthy than negligence." *Id.* at 835; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) ("conduct that does not purport to be punishment at all must involve more than the ordinary lack of due care for the prisoner's interests or safety"). As the Supreme Court explained:

> The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-38 (citations omitted). Thus, accidents, mistakes, and other types of negligence are not constitutional violations merely because the victim is a prisoner. *Acord v. Brown*, No. 93-2083, 1994 WL 679365, at *2 (6th Cir. Dec. 5, 1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Rather, what is required is a conscious disregard of a substantial risk of harm. *Farmer*, 511 U.S. at 839.

### 1. Environmental Tobacco Smoke

Plaintiff alleges that his Eighth Amendment rights were violated when ITF Defendants did not place him in a tobacco-free unit for 60 days, despite the fact that he had a medical detail indicating that he should be housed in a tobacco-free unit. *Helling v. McKinney,* 509 U.S. 25 (1993), is the seminal United States Supreme Court case in this area. In *Helling*, a prisoner initiated a § 1983 action against prison officials claiming that his involuntary exposure to ETS from

a cellmate[4] posed an unreasonable risk of serious damage to his future health in violation of the Eighth Amendment. *Helling*, 509 U.S. at 35. The Supreme Court affirmed the decision of the Court of Appeals to remand the case to the district court to allow the prisoner an opportunity to prove his case, which also required the prisoner to prove both the subjective and objective elements necessary for an Eighth Amendment violation. *Id*. Relevant to the objective element is whether the prisoner endured unreasonably high exposure to ETS that society would consider violative of contemporary standards of decency. *Id*. at 35-36. Relevant to the subjective element is whether prison officials had exhibited deliberate indifference with regard to the dangers of a prisoner's exposure to ETS. *Id*. at 36.

Plaintiff fails to satisfy the objective component for an Eighth Amendment violation. To prove the objective element, the prisoner must first show that he has been exposed to unreasonably high levels of ETS.[5] *Id*. at 35. "More than mere scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will be caused by exposure to ETS" is necessary to establish the objective component. *Id*. at 36. Second, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id*. Plaintiff alleges that he has been exposed to high levels of ETS, which was routinely discharged from other smoking prisoners. Nevertheless, Plaintiff failed to allege any facts quantifying his level of exposure to ETS. Plaintiff's conclusory allegations regarding the level of ETS to which he was exposed fail to support the objective component of an Eighth Amendment

---

[4]The cellmate in *Helling* smoked five packs of cigarettes a day. *Helling,* 509 U.S. at 35.

[5]"Plainly relevant to this determination" was the fact that the plaintiff in *Helling* had been moved to a different prison and was "no longer the cellmate of a five-pack-a-day smoker." *Helling,* 509 U.S. at 35. The Supreme Court also observed that the prison had adopted a formal smoking policy restricting smoking to certain areas and where wardens could, contingent on space availability, designate non-smoking areas in dormitory sections. *Id*. at 35-36. The Supreme Court noted that the changed policies could make it impossible for the plaintiff to prove that he would be exposed to an unreasonable risk of ETS with respect to his future health. *Id*. at 36.

claim. *See Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996); *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986); *Smith v. Rose*, 760 F.2d 102, 106 (6th Cir. 1985); *Turnboe v. Stegall*, No. 00-1182, 2000 WL 1679478, at *2 (6th Cir. Nov. 1, 2000).

The Supreme Court in *Helling* did not mandate smoke-free prisons. *Williams v. Howes,* No. 1:05-cv-817, 2007 WL 1032365, at *14 (W.D. Mich. Mar. 30, 2007) (citing *Scott v. Dist. of Columbia*, 139 F.3d 940, 942 (D.C. Cir. 1998) and *Mansoori v. Lappin,* No. 04-3241-JAR, 2007 WL 401290, at *10 (D. Kan. Feb. 1, 2007)). A prisoner's exposure to smoke must cause more than mere discomfort or inconvenience. *Talal v. White,* 403 F.3d 423, 426 (6th Cir. 2005). Plaintiff alleges that he experienced discomfort and adverse effects on his future health due to his exposure to ETS during his last four years of incarceration. (Compl. at 1, 3.) Plaintiff's allegations, however, do not suggest that his exposure to ETS caused him anything beyond discomfort. Although he alleges that he had a medical detail for a smoke-free unit, he does not allege any serious medical problem related to his ETS exposure such as asthma or allergies. *See Oliver v. Deen*, 77 F.3d 156, 159-61 (7th Cir. 1996) (an asthmatic inmate's assignment to cells with smoking inmates for 133 days resulting in ETS exposure which aggravated the plaintiff's asthma and necessitated his increased use of an inhaler failed to satisfy the objective component); *Williams,* 2007 WL 1032365, at *15 (asthmatic inmate's exposure to ETS during a seven-month period failed to satisfy the objective component).

It is also obvious from the case law in this area that the risk of which Plaintiff complains *is* one that today's society chooses to tolerate. *See Griffin v. DeRosa*, 153 F. App'x 851, 853 (3d Cir. 2005) (a prisoner's allegation that he had been exposed to ETS in inadequately ventilated restrooms over twenty months failed to show that the prisoner was exposed to unreasonably high levels of ETS contrary to contemporary standards of decency); *Hankins v.*

- 18 -

*Bethea*, No. CIVA 0:05-3334 DCNBM, 2007 WL 172509, at *6 (D.S.C. Jan. 18, 2007) ("[e]xposure

to moderate levels of cigarette smoke is a common fact of contemporary life, and [p]laintiff has

failed to present evidence to show that the amount of ETS he was exposed to during the relatively

short [5-month] period of time set forth in his [c]omplaint was at such an unreasonably high level

that it violated contemporary standards of decency"); *Colon v. Sawyer*, No. 9:03-CV-1018

LEK/DEP, 2006 WL 721763, at *9 (N.D.N.Y. Mar. 20, 2006) (asthmatic plaintiff's claim that "he

[was] housed in a dormitory unit where smoking [was] permitted, and that he [was] subjected to

ETS near the dining hall entrance and exit, as well as his speculation that such circumstances 'may

result in catastrophic harm to [him],' . . ., simply [did] not describe conditions that rise to a level

which today's society chooses not to tolerate"); *see also Conyers v. Mich. Dep't of Corr*., No. 5:06-

cv-100, 2006 WL 2644990, at *6 (W.D. Mich. Sept. 14, 2006).  Therefore, Plaintiff's allegations

fail to satisfy the objective element for an Eighth Amendment claim.

   Plaintiff further fails to meet the subjective element of the *Helling* test, i.e., that

Defendants were deliberately indifferent to Plaintiff's exposure to unreasonably high levels of ETS.

LRF prison officials had appropriate policies in place.  Policy Directive 01.03.140 states that

smoking is prohibited in prisoner housing units.  *See* MICH. DEP'T OF CORR., Policy Directive

01.03.140, ¶ B (effective Apr. 24, 2006).  The adoption of the MDOC's no-smoking policy and the

prison officials' current attitude and conduct, which reflect a "zero tolerance" for smoking in the

housing units, bears heavily on the deliberate indifference inquiry.[6]  *See Helling*, 509 U.S. at 36.

Plaintiff complains that Defendants do not enforce the smoking policy in common living areas.

(Compl. at 3.)  It is well established that imperfect enforcement of a non-smoking policy does not

---

[6]The Court notes that the Michigan Department of Corrections (MDOC) recently updated Policy Directive 01.03.140 on February 1, 2009.  The new policy prohibits smoking by offenders and MDOC employees inside all MDOC buildings and within 100 feet of any entrance to those buildings.  MICH. DEP'T. OF CORR., Policy Directive 01.03.140, ¶ G (effective Feb. 1, 2009).

rise to the level of deliberate indifference. *Talal*, 403 F.3d at 427; *Wilson v. Hofbauer*, 113 F. App'x 651, 652 (6th Cir. 2004) (imperfect enforcement of MDOC Policy Directive 01.03.140, which prohibited smoking in all occupied buildings, including housing units, "show[ed], at most, negligence by the defendants, rather than deliberate indifference"); *Moorer v. Price*, 83 F. App'x 770, 773 (6th Cir. 2003) (imperfect enforcement of MDOC Policy Directive 01.03.140 does not equate to deliberate indifference). Accordingly, Plaintiff's allegations concerning his exposure to ETS fail to state an Eighth Amendment claim.

### 2.      Exposure to paint chips

Plaintiff complains that the paint was chipping off his bed rail for a period of months and making him sick. He alleged that he would wake up with paint chips on his hands, face and mouth and that his face cloth, towel and bed sheets were covered. He contends that he experienced headaches, vomiting, diarrhea, and a rash, all allegedly caused by the paint chips.

Some courts have held that exposure to friable, i.e., broken, asbestos or flaking lead paint states a conditions of confinement claim. *See, e.g., LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir.1998) (holding that exposure to friable asbestos states cognizable conditions of confinement claim); *Mele v. Connecticut*, No. 3:06CV1741, 2007 WL 445488, at *1 (D. Conn. 2007); *Cody v. Hillard*, 88 F.Supp.2d 1049, 1055 (D.S.D. 2000) (acknowledging health risk of requiring inmate workers to scrape lead-based paint). Here, however, Plaintiff makes no allegations that the paint to which he was exposed was lead-based or that any of the Defendants would have had any reason to assume that the paint on a bed rail would be lead-based. As a consequence, Plaintiff fails to establish either the objective or subjective component of an Eighth Amendment claim. *Farmer*, 511 U.S. at 834.

### 3.      Back injury

As his third type of Eighth Amendment deprivation, Plaintiff argues that, despite having a back injury, he was forced to work at a job that required lifting and bending, resulting in further back injury. Plaintiff's allegations fall far short of meeting the subjective prong of the *Farmer* standard. Plaintiff alleges that, on May 12, 2008, Defendant Butler reinstated him to work in response to Plaintiff's grievance complaining that Defendant Wolters had unlawfully terminated him. Butler warned Plaintiff, however, that Classification Director Christian was likely to terminate Plaintiff's job again, putting Plaintiff on 00 status, preventing him from leaving his cell area during hours when other inmates were on work duty. At that point, Plaintiff simply informed Butler that his back was hurt and that Butler should just leave Plaintiff off work. Butler deemed the request a refusal to work and told Plaintiff to work or be placed immediately on 00 status. Plaintiff elected to work. While performing his job, Plaintiff experienced a back spasm that caused his legs to collapse. Plaintiff was then seen in health services. He was given a no-work detail and Plaintiff does not allege that Butler required him to work at any time thereafter.

Plaintiff's allegations wholly fail to demonstrate any subjective awareness on Butler's part of any serious risk to Plaintiff's health. Plaintiff does not allege that he was presenting obvious physical impairment caused by his back pain. He alleges only that Butler should have believed – solely from Plaintiff's statement that he had hurt his back – that ordering Plaintiff to perform his job would pose a serious risk of injury to Plaintiff's back. Plaintiff's allegations fall far short of demonstrating that Butler knew of an excessive risk to Plaintiff and was deliberately indifferent to that risk. As a result, Plaintiff fails to state an Eighth Amendment claim based on his back injury.

Plaintiff's only allegations against Defendants Morales and Cheeks involve their failure to provide him tobacco-free housing. Morales and Cheeks therefore are entitled to dismissal

from the action.  In addition, Plaintiff's Eighth Amendment claims against Defendants Kasdrof and Butler are dismissed.

### D.        Access to the Courts

Plaintiff complains that he was deprived of access to the courts by a range of conduct by Defendants Tefft, Booth, Ball, Kasdrof, Butler, Wolter, Bracy, Stine, Ault, Rogers and Butler as well as by (unknown) Fox and (unknown) Dygert, neither of whom has been listed as a Defendant in the amended complaint.  Plaintiff alleges that these individuals interfered with his preparation and filing of pleadings in the following ways: (1) they denied him an opportunity to mail a particular legal document before 10:00 a.m. on January 22, 2008; (2) they refused to give him a hand pass to go to the law library during the hours he was scheduled to work, when he was not on the library call-out list; (3) they failed to promptly make copies he needed for a filing in a lawsuit and failed to immediately copy a requested legal case; (4) they confiscated as contraband certain documents necessary for his lawsuit, finding them to be legal materials of other prisoners; and (5) they rifled through his legal folder and kicked him out of the law library.

It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977). The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners. *Id.* at 817.  The Court further noted that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them." *Id.* at 824-25.   An indigent prisoner's constitutional right to legal resources and materials is not, however, without limit.  In order to state a viable claim for interference with his access to the courts, a plaintiff must show "actual injury." *Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Talley-Bey*

*v. Knebl*, 168 F.3d 884, 886 (6th Cir. 1999); *Knop v. Johnson*, 977 F.2d 996, 1000 (6th Cir. 1992);

*Ryder v. Ochten*, No. 96-2043, 1997 WL 720482, at *1-2 (6th Cir. Nov. 12, 1997).  In other words,

a plaintiff must plead and demonstrate that the shortcomings in the prison legal assistance program

or lack of legal materials have hindered, or are presently hindering, his efforts to pursue a

nonfrivolous legal claim.  *Lewis*, 518 U.S. at 351-353; *see also Pilgrim v. Littlefield*, 92 F.3d 413,

416 (6th Cir. 1996).

> The Supreme Court has strictly limited the types of cases for which there may be an

actual injury:

> > *Bounds* does not guarantee inmates the wherewithal to transform themselves into
> > litigating engines capable of filing everything from shareholder derivative actions
> > to slip-and-fall claims.  The tools it requires to be provided are those that the inmates
> > need in order to attack their sentences, directly or collaterally, and in order to
> > challenge the conditions of their confinement.  Impairment of any other litigating
> > capacity is simply one of the incidental (and perfectly constitutional) consequences
> > of conviction and incarceration.

*Lewis*, 518 U.S. at 355.  "Thus, a prisoner's right to access the courts extends to direct appeals,

habeas corpus applications, and civil rights claims only."  *Thaddeus-X v. Blatter*, 175 F.3d 378, 391

(6th Cir. 1999) (en banc).    Moreover, the underlying action must have asserted a non-frivolous

claim.  *Lewis*, 518 U.S. at 353; *accord Hadix v. Johnson*, 182 F.3d 400, 405 (6th Cir. 1999) (*Lewis*

changed actual injury to include requirement that action be non-frivolous).

> Further, the Supreme Court squarely has held that "the underlying cause of action . . .

is an element that must be described in the complaint, just as much as allegations must describe the

official acts frustrating the litigation."  *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing

*Lewis*, 518 U.S. 353 & n.3).   The *Christopher* Court held that, "[l]ike any other element of an access

claim, the underlying cause of action and its lost remedy must be addressed by allegations in the

complaint sufficient to give fair notice to a defendant."  *Christopher*, 536 U.S. at 416.

Plaintiff's allegations fail to show that he suffered actual injury to any pending or contemplated litigation.  While he references certain cases he was working on, he does not allege that he missed any filing deadline or experienced any adverse action in any pending case as a result of the alleged interference or delays.  In addition, while he mentions that his underlying litigation involved civil rights claims, he does not describe the bases for those claims or otherwise demonstrate that the actions involved were non-frivolous. *Lewis*, 518 U.S. at 353.  For both reasons, he fails to show the actual injury required to state an access-to-the-courts claim against any Defendant.  Since the only claim alleged against Defendants Norm Peirce, (unknown) Bracy, J. Rozier and D. Boseley are access-to-the-courts claims, those Defendants are entitled to dismissal from the action.

### E.    Due Process

Plaintiff alleges that he was deprived of his rights to both substantive and procedural due process by some or all of the alleged actions of the various Defendants.  Arguably, Plaintiff refers to his allegations involving the handling of his grievances and the filing and handling of major and minor misconduct charges against him.

#### 1.    Procedural due process

To the extent Plaintiff alleges that he was deprived of due process in his frequently invoked grievance procedures, he fails to state a due process claim.  "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)).  The Sixth Circuit and other circuit courts have held that there is no constitutionally protected due process right to an effective prison grievance procedure. *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Young v. Gundy,* 30 F. App'x 568,

569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).  Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994).  Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process.

Similarly, Plaintiff asserts a due process claim based on allegedly false minor misconduct charges.  A prisoner does not have a protected liberty interest in prison disciplinary proceedings unless the resulting restraint imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *See Sandin v. Conner*, 515 U.S. 472, 486 (1995).  Punishments for minor misconduct violations include up to five days of "toplock" (confinement to quarters), 15 days' loss of privileges, assignment to up to 20 hours of extra duty, counseling, reprimand and restitution.  MICH. DEP'T OF CORR., Policy Directive 03.03.105, Att. D. None of the possible sanctions for minor misconduct convictions amounts to an atypical or significant hardship.  *See Green v. Waldren*, No. 99-1561, 2000 WL 876765, at *2 (6th Cir. June 23, 2000).  Plaintiff does not allege that he lost any good-time credits as a result of a minor misconduct conviction.  Because Plaintiff did not suffer an infringement of any liberty interest as a result of any minor misconduct charge, he fails to state a claim against any Defendant.  *See Green*, 2000 WL 876765, at *2 ("Green had no due process liberty interest in the minor misconduct hearing because he did not allege any punishment that affected the duration of his confinement, or that constituted an atypical and significant hardship."); *Staffney v. Allen*, No. 98-1880, 1999 WL 617967, at *2 (6th Cir. Aug. 12, 1999) ("Staffney suffered no loss of good time credits as a result of his

minor misconduct conviction and the sanctions he received do not represent a liberty interest recognized by the constitution.").

Plaintiff also appears to claim that he was denied due process by the filing, investigation and conviction of a false major misconduct charge.  The Supreme Court has held that claims for declaratory relief and monetary damages that necessarily imply the invalidity of the punishment imposed are not cognizable under § 1983 until the conviction has been overturned. *Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (addressing allegations of deceit and bias on the part of the decisionmaker in a misconduct hearing).  The *Edwards* Court relied upon *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), which held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, *or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid,* a § 1983 plaintiff must prove that the conviction or sentence has been [overturned]."  *Edwards*, 520 U.S. at 646 (emphasis in original). As the Supreme Court recently has stated, "[t]hese cases, taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation) – no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) – *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration."  *Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005).  Thus, where a prisoner's claim of unfair procedures in a disciplinary hearing necessarily implies the invalidity of the deprivation of good-time credits, his claim is not cognizable under § 1983.  *Id.*; *see also Thomas v. Eby*, 481 F.3d 434, 438 (6th Cir. 2007); *Bailey v. McCoy*, No. 98-1746, 1999 WL 777351, at *2 (6th Cir. Sept. 21, 1999) (collecting Sixth Circuit decisions applying *Edwards* to procedural due process challenges).

In *Muhammad v. Close*, 540 U.S. 749, 754-55 (2004), the Supreme Court clarified that *Edwards* requires the favorable termination of a disciplinary proceeding before a civil rights action may be filed only in cases where the duration of the prisoner's sentence is affected. *Id.*; *Thomas*, 481 F.3d at 439; *Johnson v. Coolman*, 102 F. App'x 460, 461 (6th Cir. 2004). The Court noted that "[t]he effect of disciplinary proceedings on good-time credits is a matter of state law or regulation." *Muhammad*, 540 U.S. at 754. Under Michigan law, a prisoner loses good-time credits for the month of his major misconduct disciplinary conviction. *See* MICH. COMP. LAWS § 800.33. In addition, the warden may order forfeiture of previously accumulated good-time credits in cases. *Id.* Plaintiff does not assert that he did not forfeit good-time credits for the month of his conviction. Accordingly, Plaintiff's procedural due process claim remains noncognizable under § 1983 because a ruling on the claim would, if established, necessarily imply the invalidity of his disciplinary conviction. *See Shavers v. Stapleton*, 102 F. App'x 900, 901 (6th Cir. 2004).[7]

Under Michigan law, a prisoner may seek a rehearing of a decision made by the Hearings Division within thirty calendar days after a copy of the Major Misconduct Hearing Report is received. MICH. COMP. LAWS § 791.254; MICH. DEP'T OF CORR. Policy Directive 03.03.105, ¶ DDD (effective Jan. 1, 2007). Upon denial of his motion for rehearing, a prisoner may file an application for leave to appeal in the state circuit court. *See* MICH. COMP. LAWS § 791.255(2);

---

[7]For similar reasons, Plaintiff's allegation that the major misconduct charge was retaliatory also is barred by *Heck* and *Edwards*. *See Ruiz v. Bouchard*, 60 F. App'x 572, 573 (6th Cir. 2003) (First Amendment retaliation claim barred by *Heck* and *Edwards*); *Clemons v. Cook*, 52 F. App'x 762, 763 (6th Cir. 2002) (claim that guard retaliated for the exercise of First Amendment rights was *Heck*-barred); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000) (prisoner's claim that his due process and Eighth Amendment rights were violated by false, retaliatory misconduct charges necessarily implies the invalidity of the guilty findings on the misconduct tickets).

Policy Directive 03.03.105, ¶ GGG (concerning appeal).  If he is not successful, he may then seek to overturn the convictions by bringing a federal habeas corpus action.[8]

Plaintiff has not alleged that he pursued relief in the state courts, nor does he allege that he sought to overturn his misconduct convictions in a habeas petition.  Moreover, his allegations make clear that his conviction has not been invalidated.  Accordingly, Plaintiff's § 1983 claim is not presently cognizable.  He therefore fails to state a claim on which relief can be granted.  *See Morris v. Cason*, 102 F. App'x 902, 903 (6th Cir. 2004) (a claim barred by *Heck* is properly dismissed for failure to state a claim); *Murray v. Evert*, 84 F. App'x 553, 555(6th Cir. 2003) (same); *Harris v. Truesdell*, 79 F. App'x 756, 758-59 (6th Cir. 2003) (same).

As a consequence, Plaintiff fails to state a procedural due process claim against any Defendant for the handling of grievances or major or minor misconducts.

### 2.    Substantive due process

In addition, the Substantive Due Process Clause does not provide any basis for relief.  "A plaintiff asserting a substantive due process claim faces a virtually insurmountable uphill struggle.  He must show that the government conduct in question was so reprehensible as to 'shock the conscience' of the court."  *Rimmer-Bey v. Brown*, 62 F.3d 789, 791 n.4 (6th Cir. 1995) (citing *Rochin v. California*, 342 U.S. 165 (1952); *Mertik v. Blalock*, 983 F.2d 1353, 1367-68 (6th Cir. 1993)); *see also Hampton v. Hobbs*, 106 F.3d 1281, 1288 (6th Cir. 1997).  Plaintiff's allegations in this case fail to meet this formidable standard, and, thus, he fails to state a claim that his substantive due process rights were violated.

---

[8]A misconduct conviction results in the loss of good-time credits, which is equivalent to a loss of a "shortened prison sentence."  *Wolff v. McDonnell*, 418 U.S. 539, 556-57 (1974).  A challenge to a "shortened" prison sentence is a challenge to the fact or duration of confinement that is properly brought as an action for habeas corpus relief.  *Preiser v. Rodriguez*, 411 U.S. 475, 487-88 (1973).  However, a prisoner must exhaust available state remedies before bringing a habeas corpus action, which would include appealing the conviction through the state courts.  *See* 28 U.S.C. § 2254(b)(1).

### F.   Retaliation

Plaintiff alleges a variety of retaliatory conduct by numerous Defendants. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Thaddeus-X*, 175 F.3d at 394.  Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Hall v. Nusholtz*, No. 99-2442, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000).  Similarly, the filing of a lawsuit involving prison conditions is protected conduct.  *Bell v. Johnson*, 308 F.3d 594, 607 (6th Cir. 2002).

Although Plaintiff has alleged that he engaged in protected conduct, he cannot show that his transfer to OTF was an adverse action taken against him for filing grievances and lawsuits against some Defendants.  As the Sixth Circuit explained in *Ward v. Dyke,* 58 F.3d 271 (6th Cir. 1995):

> Prisoners do not have a constitutional right to be incarcerated in any particular institution. *See Meachum v. Fano*, 427 U.S. 215 (1976). Moreover, the Supreme Court has held repeatedly that the ability to transfer prisoners is essential to prison management, and that requiring hearings for such transfers would interfere impermissibly with prison administration. *Id.*; *Olim v. Wakinekona*, 461 U.S. 238 (1983); *Montanye v. Haymes*, 427 U.S. 236 (1976). "Whatever expectation the

- 29 -

prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." *Meachum*, 427 U.S. at 228.

*Ward*, 58 F.3d at 274.  "Since prisoners are expected to endure more than the average citizen, and since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005). *See, e.g., Smith v. Yarrow*, 78 F. App'x. 529, 543 (6th Cir. 2003) ("transfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights") (internal quotation marks omitted).  If, however, a foreseeable consequence of a transfer would be to substantially inhibit a prisoner's ability to access the courts, then such a transfer could be considered an "adverse action" that would deter a person of ordinary firmness from continuing to engage in the protected conduct. *See Sigger-El*, 412 F.3d at 702 (holding that a transfer was an "adverse action," where the transfer resulted in plaintiff losing a high paying job that paid for his lawyer fees and moved him further from the attorney); *Johnson v. Beardslee,* No. 1:06-CV-374, 2007 WL 2302378, at *5 (W.D. Mich. Aug. 8, 2007).

Plaintiff's transfer was from one level I facility to another level I facility.  Plaintiff has no constitutional right to remain at a specific facility or to prevent a transfer to another level I facility.  *Ward*, 58 F.3d at 274.  Plaintiff does not allege that his access to the courts was compromised as a result of the transfer.  He does allege that he was unable to participate in two rehabilitation groups for which he had been on the waiting list for five months, and he alleges that he no longer could participate in a sexaholics anonymous group, which was not available at any other facility.  Plaintiff does not have a federally cognizable liberty interest in participating in rehabilitative programs.  Federal courts have consistently found that prisoners have no

- 30 -

constitutionally protected liberty interest in prison vocational, rehabilitation, and educational programs based on the Fourteenth Amendment. *See, e.g.*, *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1995) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services); *Carter v. Morgan*, No. 97-5580, 1998 WL 69810, at *2 (6th Cir. Feb. 10, 1998) (no constitutional right to educational classes); *Tribell v. Mills*, No. 93-5399, 1994 WL 236499, at *1 (6th Cir. June 1, 1994) ("[N]o constitutional right to vocational or educational programs").  Under these authorities, Plaintiff has no constitutional claim arising from his alleged inability to participate in programs because of his transfer to OTF.  Therefore, the transfer is insufficient to constitute an adverse action and Plaintiff fails to state a claim for retaliation.

Plaintiff has alleged that the sole "retaliatory" actions taken by ITF Defendant Larabell, OTF Defendants Showers, Krick, and Lafler, and MDOC Central Office employees Gibbons, Scott, Gilbert and LeDuke involved participating or conspiring in the allegedly retaliatory transfer of Plaintiff from ITF to OTF.  In addition, the only remaining claims against Defendants Ault and Dingeldey are for the allegedly retaliatory transfer.  As a consequence, Defendants Larabell, Showers, Krick, Lafler, Gibbons, Scott, Gilbert, LeDuke, Ault and Dingeldey are entitled to dismissal from the action.

Plaintiff's remaining allegations of retaliation are sufficient to warrant service of the complaint.

### Conclusion

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that Defendants MDOC, Carmen Palmer, D. Bolton, Fritz Jackson, N. Morales, (unknown) Cheeks, T. Kasdrof, Michael Larabell, Norm Pierce, (unknown) Bracy, J. Rozier, D. Boseley, Bradley Showers, Blaine Lafler, Laura Krick, L. Gibbons, R. Gilbert, B. Scott, C. LeDuke, Doug Dingeldey, and R. Ault will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).  The Court also will dismiss Plaintiff's Eighth Amendment, due process, and access-to-the-courts claims, as well as his First Amendment retaliation claims based on the transfer to OTF as against all remaining Defendants.  The Court will serve the complaint against Defendants Patricia Caruso, Gary Ball, Holly Stine, Elly Wolter, Todd Butler, J. Booth, T. McKendry and Lillian Tefft solely on the retaliation claims not dismissed, such as the alleged filing of retaliatory minor misconducts and the false completion of his parole and prisoner re-entry forms.

An Order consistent with this Opinion will be entered.


Dated:  March 12, 2009                                    _____/s/ Gordon J. Quist_____
                                                                            GORDON J. QUIST
                                                                            UNITED STATES DISTRICT JUDGE